**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JENNIFER A. RHODES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1515** |
| | ) | **District Judge David S. Cercone** |
| **RHODA WINSTEAD, Superintendent,** | ) | **Magistrate Judge Lisa Pupo Lenihan** |
| **SCI-Cambridge Springs, the DISTRICT** | ) | |
| **ATTORNEY OF ALLEGHENY** | ) | |
| **COUNTY, and the ATTORNEY** | ) | |
| **GENERAL OF PENNSYLVANIA,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## REPORT AND RECOMMENDATION

Petitioner Jennifer A. Rhodes ("Rhodes"), presently incarcerated at the State Correctional Institution in Cambridge Springs, Pennsylvania ("SCI-Cambridge Springs"), has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Commonwealth of Pennsylvania contends that the petition should be denied, and that no certificate of appealability ("COA") be issued. This matter has been referred to the undersigned United States Magistrate Judge for a report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B). It is recommended that the petition for a writ of habeas corpus be denied, and that no COA be issued.

## I.     Background

At some point in March 1990, Rhodes became employed as a nursing assistant in the infirmary of the Congregational Center for Retirement Living (the "Center"), which was located at 2200 West Liberty Avenue, in Pittsburgh, Pennsylvania. Trial Transcript ("TT") at 217-219. She was 31 years old at that time. On the night of Thursday, April 12, 1990, Rhodes began to

1

work a shift beginning at 11:00 P.M. and concluding at 7:00 A.M. the following day.  TT at 223.

Friday, April 13, 1990, was Good Friday.  TT at 86.  After working her shift, Rhodes returned to

her home in Beltzhoover, Pennsylvania.

At approximately 9:05 A.M. on April 13, 1990, Phillip Charles Simpson ("Simpson"), a

driver for the Yellow Cab Company of Pittsburgh, received a call requesting that he pick Rhodes

up in downtown Pittsburgh.  TT at 110.  Simpson picked up Rhodes, who asked him to take her

to Main Loan Office, Inc., a pawn shop located at 503 East Ohio Street, on the north side of

Pittsburgh.  TT at 111, 126.  After being transported to her requested destination, Rhodes sold a

ring for $60.00.  TT at 127.  Roughly two hours later, Rhodes entered Pitt Loan Company, Inc., a

pawn shop located at 603 East Ohio Street, and sold a different ring for $150.00.  TT at 131.

Later that day, Geri Cordes ("Cordes"), a daylight charge nurse employed by the Center,

received word that 88-year-old Bertha Boyle ("Boyle"), a retired teacher who resided on the

fourth floor of the Center, had not shown up for lunch.  TT at 64-65.  Cordes, who had a master

key, unlocked the door to Boyle's apartment and went inside.  TT at 65-66.  After entering the

apartment, Cordes discovered Boyle lying dead on the floor, next to her bed.  TT at 66-69.

Cordes immediately dialed 9-1-1 and reported her discovery.  TT at 68.

Detective Anthony Condemi ("Condemi"), a police officer employed by the City of

Pittsburgh Bureau of Police ("Police Bureau"), received a call at approximately 1:30 P.M. on

April 13, 1990, indicating that an elderly woman had been found dead at the Center.  TT at 38.

When he arrived at the Center, Condemi entered Boyle's apartment with a uniformed police

officer.  TT at 40-41.  His examination of Boyle's body revealed "at least four puncture

wounds."  TT at 42.  A subsequent autopsy revealed that Boyle had been stabbed three times in

her neck and seven times in her chest.  TT at 143.  Rhodes' finger prints were found in various places throughout Boyle's apartment.  TT at 122-123.

On Wednesday, April 18, 1990, Detective Joseph Meyers ("Meyers"), a Pittsburgh police officer, traveled to the two pawn shops that Rhodes had visited and retrieved the rings that had been sold by her.  TT at 170.  He showed the rings to Louise Keefer ("Keefer"), a resident of the Center who had previously taught with Boyle.  TT at 108, 170.  Keefer identified the rings as having belonged to Boyle.  *Id.*

Later that day, Detective Paul Marraway ("Marraway") and another police officer went to Rhodes' home and asked her to accompany them to a police station operated by the Police Bureau.  TT at 179.  Rhodes, who was not under arrest at the time, agreed to travel to the police station in order to answer some questions.  *Id.*  Upon arrival, Rhodes was questioned about the rings that she had sold at the two pawn shops.  TT at 182.  She stated that she had discovered a bag outside of the entrance to the Center used by employees, and that the rings had been inside of the bag.  TT at 182-184.  She denied that she had ever been inside of Boyle's apartment.  TT at 183.

Rhodes was interviewed by Detectives Ronald Freeman ("Freeman") and Robert McCabe ("McCabe") at approximately 4:15 P.M. on Wednesday, April 18, 1990.  TT at 202. She was informed that she was not under arrest, and that she was free to leave.  TT at 203. Rhodes nevertheless expressed her willingness to talk to Freeman and McCabe.  *Id.*  Even though Freeman did not consider Rhodes to be in custody, he recited her Fifth and Fourteenth Amendment rights in accordance with *Miranda v. Arizona*, 384 U.S. 436 (1966).  TT at 204. Rhodes signed a form indicating that she had been advised of her "*Miranda* rights."  TT at 205.

When questioned about the rings, Rhodes repeated the story that she had told Marraway. TT at 206.  She again denied that she had ever been inside of Boyle's apartment.  *Id.*  Freeman informed Rhodes that her finger prints had been found throughout the apartment.  TT at 206-207.  At that point, Rhodes admitted that she had stabbed Boyle to death after Boyle had accused her of stealing money.  TT at 207.  This confession occurred at approximately 4:32 P.M. on Wednesday, April 18, 1990.  *Id.*  Rhodes was arrested immediately after confessing to the crime. TT at 269.

Rhodes proceeded to provide Freeman and McCabe with more details about the killing. TT at 208-210.  She explained that she had entered Boyle's apartment after hearing cries for help, and that Boyle had begun to accuse her of stealing money.  TT at 209.  She stated that she had begun to choke and punch Boyle in response to this accusation.  *Id.*  Rhodes went on to say that, after discovering a knife in one of Boyle's drawers, she had proceeded to stab Boyle in a fit of rage.  *Id.*  At 4:44 P.M. on April 18, 1990, Rhodes identified on a survey map the place where she had discarded the knife used to stab Boyle.  TT at 212.  Around 5:00 P.M., in response to the information provided by Rhodes, Detective William Hennigan ("Hennigan") recovered the knife near a driveway outside of the Center.  TT at 262-265.

At the urging of Freeman and McCabe, Rhodes agreed to give a tape-recorded statement concerning the events surrounding her attack on Boyle.  TT at 210.  On the tape, when questioned by the officers, Rhodes stated as follows:

Q.   Okay.  Will you tell us what you can and what you are willing to tell us about the death of Bertha Boyle?  You may start anywhere you wish.

A.   It wasn't intentional.  I was sitting in the hallway, and I heard somebody ask, crying for help, "Help me."  So I got up, and I looked down the hallway, and I seen her door cracked.  So I pushed it open some, and she

was on the floor by her bed.  So I put my bags by the door.  I walked in, and I helped her up to her bed, and she started asking me, "Who are you? What are you doing in here?"  You know, I said, "Well, you asked for help."  I told her I worked there, and I picked up the phone, because she was getting like, hysterical like, why I was there.  And I picked the phone up to try to call the office because I know, you know, the administration and stuff comes in the morning, and she said to get off her phone.  So I was insisting on letting somebody know, you know, there wasn't nothing funny going on.  And she got up and walked toward the door and came back with a wallet, and she opened it.  She said, "You wait right here" while she was going to the door, and she came back with a wallet.  And she opened it, and she said her money was missing, and I said, "Well, I didn't take your money."  And I told–I was telling her, "My bags are right here by the door, you know.  You can check them" or whatever, but that didn't work.  She was upset, and I just panicked.  I just started choking her, and she kind of went to the floor.  And I thought she was dead, but she wasn't.

Q.     How do you know she wasn't?

A.     I felt her pulse.

Q.     Okay.  I'm sorry.  Go ahead.

A.     And so I was real nervous and scared and sweating, and I was backing up by, I guess, there was some doors were open.  And I looked, and it was like the kitchen place, and I seen a knife.  And I just started to stab her.

Q.     Okay.  Then what happened?

A.     Then after that, I was standing there for a few minutes, and I was like, "What have I done?"  You know, I was scared as heck.  And I–I was just scared.  I seen these rings on this table by a chair, and well, they were in a thing, a bag.  Well, I seen a bag.

Q.     Okay.

A.     And I opened it, and it was rings in it, and I took them.

Q.     When you say "on a thing by a chair," where?

A.     At the foot of her bed, there was a chair.  I think a tray or something was by it.

5

Q.      Okay.

A.      On the left-hand side of the chair.

Q.      Alright.  And what were the rings in?

A.      A little velvet case.  A little, like, bag.

Q.      Okay.  Then what happened?

A.      Then I looked in a couple drawers.  Then I left.

Q.      When you left, what did you do?  When you went out of her room, did you leave the door open or close it?

A.      I shut the door.

Q.      And then where did you go?

A.      In the elevator and downstairs and out.

Q.      Alright.  What time?  Okay.  What happens when you walk out the door of the Congregational Home?  Where do you go?

A.      Walked down the driveway to the bus stop.

Q.      Did you do anything on the way down the driveway?

A.      Yeah.

Q.      What?

A.      I threw the knife away I had took from her kitchen.

Q.      Okay.  And then what do you do after you throw the knife away?

A.      I got on the bus and went home.

TT at 219-222.  At a later point in the tape-recorded interview, Rhodes admitted that she had sold Boyle's rings at two different pawn shops within hours of committing the murder.  TT at 233.  She was arraigned shortly after the interview.  TT at 237.

6

II.   **Procedural History**

Rhodes was tried in the Court of Common Pleas of Allegheny County, Pennsylvania (the "trial court") before Judge Jeffrey Manning (the "trial judge") for first-degree murder, robbery, burglary and receiving stolen property.  The trial commenced on January 28, 1991, and concluded on January 31, 1991.  Rhodes' tape-recorded interview with Freeman and McCabe was played for the jury.  TT at 215-237.  The jury also heard evidence concerning the recovery of Boyle's rings, which Rhodes had sold at the pawn shops, and the discovery of Boyle's knife, which Rhodes had used to commit the murder.  TT at 110-115, 125-133, 261-265.  Rhodes testified in her own defense.  She stated that while she remembered "reaching" for Boyle, she did not remember stabbing her.  TT at 307-308.  Rhodes testified that she had wondered whether she had, in fact, stabbed Boyle after learning that Boyle had been stabbed to death.  TT at 313.  She acknowledged that she had sold Boyle's rings at the pawn shops, and that she had left the knife where Hennigan had found it.  TT at 310-311.  She also admitted that she had confessed to the murder *before* agreeing to give a tape-recorded statement.  TT at 321.  Rhodes testified that, as of the date of her testimony, she did not know whether she was the one who had actually stabbed Boyle.  TT at 343.  At no point did she deny that she had murdered Boyle.

The jury convicted Rhodes of all four charges.  TT at 547.  The trial judge immediately sentenced Rhodes to a term of life imprisonment.[1]  TT at 550-551.  Rhodes filed post-verdict motions shortly thereafter.  Doc. No. 13-3, pp. 1-8.  On April 25, 1991, the trial judge denied Rhodes' post-verdict motions and sentenced her to terms of not less than ten nor more than

---

[1]The only possible sentences in the Commonwealth of Pennsylvania for the crime of first-degree murder are death and life imprisonment.  42 PA. CONS. STAT. § 9711(a)(1).  The trial judge sentenced Rhodes to a term of life imprisonment because the Commonwealth had not requested a hearing to determine whether the death penalty should be imposed.  TT at 550-551.

twenty years of imprisonment for the crimes of robbery and burglary.  Sentencing Transcript ("ST") at 23-24.  These sentences were to run concurrently with each other but consecutive to the life sentence imposed for the first-degree murder conviction.  *Id.*  No further sentence was imposed for the crime of receiving stolen property.  ST at 24.

On April 30, 1991, Rhodes filed a notice of appeal, thereby commencing a direct appeal to the Pennsylvania Superior Court.  Doc. No. 13-3, p. 18.  That same day, she also filed a "motion for reconsideration, modification and vacation of order of judgment of sentence" in the trial court.  Doc. No. 13-3, pp. 11-14.  This motion was apparently never addressed.  Doc. No. 28, p. 17.  Rhodes filed an amended notice of appeal on May 6, 1991.  Doc. No. 13-3, pp. 33-34. On January 28, 1992, the trial judge filed a lengthy opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), explaining his reasons for denying Rhodes' post-verdict motions. Doc. No. 13-4.  In her brief to the Superior Court, Rhodes argued, *inter alia*, that the trial judge had erred in refusing to suppress her taped statement and the physical evidence obtained as a result of that statement, that there was insufficient evidence in the record to sustain her convictions for robbery and burglary, and that the trial judge had erred in refusing to give certain jury instructions that had been proposed by defense counsel.  Doc. No. 13-5.  In an opinion dated December 23, 1992, the Superior Court rejected all of Rhodes' arguments, thereby affirming her convictions for first-degree murder, robbery, burglary and receiving stolen property, as well as the sentences imposed therefor.  Doc. No. 13-8, pp. 25-39.  Rhodes filed a petition for allowance of appeal with the Pennsylvania Supreme Court on January 22, 1993.  Doc. No. 13-8, pp. 1-24. The Pennsylvania Supreme Court denied the petition on September 21, 1993.  Doc. No. 13-10, p. 1.  Rhodes apparently never petitioned the United States Supreme Court for a writ of certiorari.

Consequently, her convictions and sentences became final on December 20, 1993. *Clay v. United States*, 537 U.S. 522, 527-532 (2003).

On April 25, 1995, Rhodes filed a *pro se* petition for collateral relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA") [42 Pa. Cons. Stat. § 9541 *et seq.*]. Doc. No. 13-10, p. 3. The trial court appointed Thomas G. Lemons ("Lemons") to represent Rhodes during the PCRA proceedings. Doc. No. 13-10, p. 13. Rhodes, through counsel, filed an amended PCRA petition on January 16, 1997, contending that her Sixth and Fourteenth Amendment rights had been violated by the deficient performance of her counsel both at trial and on direct appellate review. Doc. No. 13-10, pp. 14-19. The trial court issued a notice of intention to dismiss on June 27, 1997. Doc. No. 13-10, p. 26. On July 7, 1997, the trial court formally denied Rhodes' PCRA petition. Doc. No. 13-10, p. 27.

Rhodes filed a *pro se* notice of appeal. Doc. No. 13-11, p. 1. Mistakenly believing that Lemons was no longer representing her, Rhodes sought the appointment of counsel to handle her appeal. Doc. No. 13-11, pp. 26-27. Lemons petitioned the Superior Court for permission to withdraw from the case, but the petition was denied. Doc. No. 13-11, pp. 31-37. On December 29, 1997, the trial judge filed an opinion explaining his reasons for denying Rhodes' PCRA petition. Doc. No. 13-11, pp. 20-24. The Superior Court affirmed the denial of the petition in an opinion dated June 16, 1999. Doc. No. 13-12, pp. 24-28.

In a letter to Rhodes dated June 22, 1999, Lemons stated as follows:

> Enclosed please find the Superior Court ruling on your appeal. As is obvious from the enclosure, the lower Court ruling has been affirmed. Should you wish to appeal this matter, you have until July 16, 1999 to do so.
> As you are aware, I was only appointed to handle the Superior Court aspect on this matter and therefore will not be pursuing an appeal to the Supreme Court. Further, I do not see any legal basis for further appeal.

Doc. No. 21-2, p. 1.  Lemons' reference to a possible "appeal" to the Pennsylvania Supreme

Court evidently led Rhodes to believe that she could pursue such an appeal as a matter of right.

Rhodes proceeded to file a "notice of appeal" with the Pennsylvania Supreme Court on July 14,

1999.  Doc. No. 23-3, p. 23.  Unfortunately, this document is not a part of the record, making it

difficult for the Court to ascertain its precise contents.  Doc. No. 21, p. 7.  Nevertheless, the

contents of that document can be partially ascertained by a letter to Rhodes from the

Pennsylvania Supreme Court's Prothonotary dated July 23, 1999, which stated as follows:

> We are in receipt of your Notice of Appeal on the above-captioned matter.
> Generally, an appeal of an Order from the Common Pleas Court Criminal
> Division is appealable to Superior Court.  There are only limited circumstances
> under which a direct appeal to Supreme Court is authorized.
> In addition, any appeal must be filed within 30 days of the lower Court's
> decision.  It appears that your appeal is untimely since the Court Order was
> entered on June 16, 1999.  We suggest, therefore, that you contact your attorney
> for assistance.
> Accordingly, we are returning your appeal to you.

Doc. No. 23-3, p. 1.  Under Pennsylvania law, an appeal "improvidently taken to the Supreme

Court" is supposed to be treated as a petition for allowance of appeal.  42 PA. CONS. STAT. §

724(b).  The wording of Rhodes' *pro se* "notice of appeal," however, may have led the

Pennsylvania Supreme Court to believe that she was attempting to directly appeal the ruling of

the trial court rather than the decision of the Superior Court affirming that ruling.

Rhodes apparently responded to the Prothonotary with a letter dated August 6, 1999.  On

August 16, 1999, the Prothonotary sent Rhodes a letter conveying the following message:

> We are in receipt of your correspondence dated August 6, 1999.  Please be
> advised, you must file your Petition for Appointment of Counsel with the
> Common Pleas Court.  You may also file a Request for Reinstatement of Appeal

> Rights with the trial court since you did not timely file a Petition for Allowance of
> Appeal with this Court.

Doc. No. 23-3, p. 2.  After receiving this message, Rhodes attempted to learn how to petition the

trial court for relief.  She filed a second PCRA petition with the trial court in July 2000.  Doc.

No. 13-13, p. 1.  It was postmarked with the date of July 18, 2000, and received by the trial court

on July 26, 2000.[2]  *Id.*  Rhodes sought the reinstatement of her right to petition the Pennsylvania

Supreme Court for discretionary review.  The trial court did not act on her petition.  On March

29, 2001, Rhodes sent a handwritten letter to the trial court inquiring about the status of the

matter.  Doc. No. 21-2, pp. 18-20.  In that letter, she expressed concern that the delay in

adjudicating her PCRA petition would interfere with "further appeals" to "the federal courts."

Doc. No. 21-2, p. 18.

Having received no response, Rhodes filed a petition for a writ of mandamus in the trial

court on September 19, 2001, seeking an order compelling the trial judge to act on her pending

PCRA petition.  Doc. No. 13-14, pp. 1-2.  The mandamus petition was evidently ignored.

Rhodes continued to send correspondence to the Pennsylvania Supreme Court.  In a letter to

Rhodes dated February 3, 2003, Deputy Prothonotary John A. Vaskov ("Vaskov") explained:

> With respect to the PCRA matter that you indicate has been pending in
> common pleas court since July 26, 2000, this office has no authority to intervene
> on your behalf.  If you wish to present to the Supreme Court your claim that the
> common pleas court should be required to rule on your PCRA petition, more than
> a letter is required.  You must file a petition for writ of mandamus and an
> application for leave to file original process.  We are enclosing for your reference
> copies of pages from a "Pro Se Manual" developed to assist persons not
> represented by counsel understand and prepare documents for filing in the

---

[2]The postmarked date is faded and illegible.  Doc. No. 13-13, p. 1.  Rhodes contends that her PCRA
petition was postmarked with the date of July 18, 2000.  Doc. No. 21, p. 9.  Because the Commonwealth does not
dispute this assertion, the Court assumes it to be true.

Supreme Court.

Doc. No. 21-3, pp. 4-5.  The trial judge apparently learned that Rhodes' PCRA petition was pending on February 4, 2003, when Assistant District Attorney Rebecca Spangler ("Spangler") forwarded to him a copy of a letter sent by Rhodes to the Pennsylvania Supreme Court.  Doc. No. 23-3, p. 31.  Although the record is somewhat unclear as to this matter, it appears that the trial judge had previously been unaware of Rhodes' petition because of her failure to serve him with a copy of it.  *Id.*  Meanwhile, in response to Vaskov's letter, Rhodes filed a petition for a writ of mandamus and an application for leave to file original process with the Pennsylvania Supreme Court.

On June 25, 2003, the trial judge issued a notice of intention to dismiss Rhodes' petition on the ground that it had not been filed within the one-year limitations period established by 42 PA. CONS. STAT. § 9545(b)(1).  Doc. No. 13-14, p. 6.  As an alternative ground to support his notice of intention to dismiss, the trial judge indicated that Rhodes' claims had been waived.  *Id.*  In a responsive filing, Rhodes argued that her PCRA petition should not be dismissed.  Doc. No. 13-14, pp. 7-8.  She also sought the appointment of counsel to handle the matter.  *Id.*  On August 26, 2003, the Pennsylvania Supreme Court granted Rhodes' application for leave to file original process but denied her petition for a writ of mandamus.  Doc. No. 23-3, p. 28.  While the Pennsylvania Supreme Court did not explicitly give a reason for denying Rhodes' request for mandamus relief, the denial was presumably based on the fact that the trial judge had issued a notice of intention to dismiss the petition.  Doc. No. 23-3, p. 30.

The trial judge did not rule on the PCRA petition.  Rhodes filed an application for the speedy disposition of her petition on October 1, 2003.  Doc. No. 13-14, pp. 13-14.

Rhodes filed a petition for a writ of habeas corpus with this Court on October 31, 2005. Doc. No. 1.  On November 3, 2005, the Federal Public Defender's Office was appointed to represent Rhodes in this proceeding.  Doc. No. 4.  Rhodes filed a memorandum of law in support of her petition for a writ of habeas corpus, along with a request for an evidentiary hearing, on April 16, 2007.  Doc. No. 21.  After reviewing Rhodes' filings, the Commonwealth filed an answer to her PCRA petition in the trial court acknowledging that her right to file a petition for allowance of appeal with the Pennsylvania Supreme Court should be reinstated *nunc pro tunc*. Doc. No. 23-2, pp. 1-3.  In an order dated May 11, 2007, the trial judge reinstated Rhodes' right to seek discretionary review of the Superior Court's June 16, 1999, decision denying her initial PCRA petition.  Doc. No. 23-4, p. 1.  The trial court appointed counsel to handle Rhodes' petition for allowance of appeal.  Doc. No. 34-2, p. 5.  On May 31, 2007, proceedings in this Court were stayed pending the conclusion of the proceedings in the Pennsylvania courts.  Doc. No. 26.  Rhodes filed her petition for allowance of appeal on June 7, 2007.  Doc. No. 34-2, pp. 1-23.  The Pennsylvania Supreme Court denied the petition on December 4, 2007, thereby completing the PCRA proceedings.  Doc. No. 28-8, p. 2.

On December 3, 2008, Rhodes filed an amended petition for a writ of habeas corpus. Doc. No. 28.  The stay was lifted on December 18, 2008.  Doc. No. 29.  The amended petition is the subject of this report and recommendation.

III.  **Standards of Review**

A.  **Exhaustion and Procedural Default**

The exhaustion requirements applicable to claims asserted in a federal habeas corpus petition are rooted in subsections (b) and (c) of 28 U.S.C. § 2254, which provide:

### § 2254.  State custody; remedies in Federal courts

***
(b)(1) An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted unless it appears
that--
(A) the applicant has exhausted the remedies available in the courts of the State;
or
(B)(i) there is an absence of available State corrective process; or
(ii) circumstances exist that render such process ineffective to protect the rights of
the applicant.
(2) An application for a writ of habeas corpus may be denied on the merits,
notwithstanding the failure of the applicant to exhaust the remedies available in
the courts of the State.
(3) A State shall not be deemed to have waived the exhaustion requirement or be
estopped from reliance upon the requirement unless the State, through counsel,
expressly waives the requirement.
(c) An applicant shall not be deemed to have exhausted the remedies available in
the courts of the State, within the meaning of this section, if he has the right under
the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)-(c).  Consistent with this statutory mandate, each claim that a petitioner in

state custody attempts to present to a federal court in a habeas corpus proceeding must have been

"fairly presented" to each level of the applicable State's judiciary.  *Lines v. Larkins*, 208 F.3d

153, 159 (3d Cir. 2000).  "To 'fairly present' a claim, a petitioner must present a federal claim's

factual and legal substance to the state courts in a manner that puts them on notice that a federal

claim is being asserted."  *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  Federal

courts typically dismiss without prejudice claims that have not been properly presented to the

state courts, thereby providing petitioners with an opportunity to exhaust such claims.  *Lines*,

208 F.3d at 159-160.

Where a claim asserted in a habeas corpus proceeding has not been presented to the state

courts, the statutory exhaustion requirement can be satisfied on the alternative ground that there

is "an absence of *available* State corrective process."  28 U.S.C. § 2254(b)(1)(B)(i)(emphasis

added).  This alternative ground requires a showing that state procedural rules preclude the

petitioner from exhausting his or her claims in the state courts.  *Lines*, 208 F.3d at 160.  In order

for the exhaustion requirement to be satisfied on this ground, however, the applicable procedural

rules must "clearly foreclose" review of the petitioner's unexhausted claims by the state courts.

*Whitney v. Horn*, 280 F.3d 240, 250 (3d Cir. 2002).  It is not sufficient for the petitioner to show

that it is "unlikely" that further state remedies are available.  *Id.*

      The mere fact that a petitioner can satisfy the statutory exhaustion requirement on the

ground that further state procedures are unavailable does not necessarily mean that a federal

court can reach the merits of his or her claims.  *Lines*, 208 F.3d at 160.  Claims deemed to have

been exhausted because of a state procedural bar are procedurally defaulted, precluding a federal

court from proceeding to address them further.  *Id.*  In *Cone v. Bell*, 129 S.Ct. 1769 (2009), the

United States Supreme Court explained:

> It is well established that federal courts will not review questions of federal law
> presented in a habeas petition when the state court's decision rests upon a state-
> law ground that "is independent of the federal question and adequate to support
> the judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115
> L.Ed.2d 640 (1991); *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151
> L.Ed.2d 820 (2002).  In the context of federal habeas proceedings, the
> independent and adequate state ground doctrine is designed to "ensur[e] that the
> States' interest in correcting their own mistakes is respected in all federal habeas
> cases."  *Coleman*, 501 U.S. at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640.  When a
> petitioner fails to properly raise his federal claims in state court, he deprives the
> State of "an opportunity to address those claims in the first instance" and
> frustrates the State's ability to honor his constitutional rights.  *Id.*, at 732, 748,
> 111 S.Ct. 2546, 115 L.Ed.2d 640.  Therefore, consistent with the longstanding
> requirement that habeas petitioners must exhaust available state remedies before
> seeking relief in federal court, we have held that when a petitioner fails to raise
> his federal claims in compliance with relevant state procedural rules, the state
> court's refusal to adjudicate the claim ordinarily qualifies as an independent and
> adequate state ground for denying federal review. See *id.*, at 731, 111 S.Ct. 2546,

115 L.Ed.2d 640.

*Cone*, 129 S.Ct. at 1780 (brackets in original).  This does not mean, however, that federal habeas corpus review is barred every time  a state court invokes a procedural rule to preclude its review of the federal claims asserted by a state prisoner.  *Id.*  The adequacy of a given state procedural rule to bar a federal court from reaching the merits of a petitioner's claim is a federal question. *Wright v. Georgia*, 373 U.S. 284, 288-293 (1963).  A state procedural rule can preclude federal habeas corpus review only if it is "firmly established" and "consistently and regularly applied" by the State's courts.  *Kindler v. Horn*, 542 F.3d 70, 78 (3d Cir. 2009).  "In addition, the state rule must speak in unmistakable terms, and the state courts' refusal to review a petitioner's claim must be consistent with decisions in similar cases."  *Id.* at 79.  "[A]n occasional act of grace by a state court in excusing or disregarding a state procedural rule does not render the rule inadequate."  *Amos v. Scott*, 61 F.3d 333, 342 (5th Cir. 1995).  A state rule is adequate to preclude federal habeas corpus review if it is applied by the state courts in "the vast majority of cases."  *Dugger v. Adams*, 489 U.S. 401, 410, n. 6 (1989).

In certain instances, a federal court may entertain claims that would ordinarily be subject to procedural default.  Because a writ of habeas corpus is an equitable remedy, the Supreme Court has found it inappropriate to rigidly apply the doctrine of *res judicata* in this context. *Schlup v. Delo*, 513 U.S. 298, 319 (1995).  A procedural default can be excused upon a showing of "cause" for the default and resulting "prejudice" to the petitioner.  *Johnson v. Pinchak*, 392 F.3d 551, 563 (3d Cir. 2004)("A procedural default generally bars review of a federal habeas corpus petition *absent a showing of cause and prejudice*.")(emphasis added).  Cause for not exhausting a claim exists where an external impediment, "whether it be government interference

16

or the reasonable unavailability of the factual basis for the claim," prevents the petitioner from exhausting the claim during the pendency of state judicial proceedings. *McCleskey v. Zant*, 499 U.S. 467, 497 (1991). If a petitioner can establish "cause" for procedurally defaulting a claim, he or she must shoulder the additional burden of showing "not merely that the errors at his [or her] trial created a *possibility* of prejudice, but that they worked to his [or her] *actual* and substantial disadvantage, infecting his [or her] trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982)(emphasis in original). If a procedural default results from the ineffective assistance of counsel, the Sixth and Fourteenth Amendments require that the responsibility for the default be imputed to the State, which may not "[conduct] trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Murray v. Carrier*, 477 U.S. 478, 488 (1986)(brackets in original), quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). Nonetheless, an error by the petitioner's attorney can constitute "cause" for a procedural default only where it is sufficiently egregious to constitute a constitutional violation under the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Hull v. Freeman*, 991 F.2d 86, 91 (3d Cir. 1993).

Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a fundamental miscarriage of justice. *Johnson*, 392 F.3d at 564. This exception to the procedural default doctrine is based on the principle that, in certain instances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 495, quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982). The

"prototypical example" of a miscarriage of justice is a situation in which an underlying constitutional violation has led to the conviction of an innocent defendant. *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992). In that instance, the merits of a petitioner's claims can be considered notwithstanding his or her failure to raise them before the state courts. *Johnson*, 392 F.3d at 564.

In order to avail himself or herself of this exception to the procedural default rule, a petitioner must make a substantial showing that he or she is actually innocent of the crime for which he or she is incarcerated. *Schlup*, 513 U.S. at 324. "To be credible, such a claim requires [the] petitioner to support his [or her] allegations of constitutional error with new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *Id.* If this requirement is satisfied, the federal court must consider "whether it is more likely than not that no reasonable juror would have convicted [the petitioner] in light of the new evidence." *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004). This standard "does not merely require a showing that a reasonable doubt [as to the petitioner's guilt] exists in the light of the new evidence, but rather that no reasonable juror would have found the [petitioner] guilty." *Schlup*, 513 U.S. at 329. "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House v. Bell*, 547 U.S. 518, 538 (2006). While the petitioner's innocence need not be determined with "absolute certainty" at this "gateway stage," his or her burden is to demonstrate that, in light of the new evidence, it is more likely than not that *any* reasonable juror would have reasonable doubt as to the petitioner's guilt. *Id.*

In the habeas corpus context, a federal court sits to ensure that an individual is not

imprisoned in violation of the Constitution and laws of the United States, "not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). Consequently, a finding of "actual innocence" is not an independent ground for habeas corpus relief, but rather a "gateway" through which a petitioner can pass to have a federal court consider underlying claims that would otherwise be subject to procedural default. *Id.* at 404. In the absence of new evidence of the petitioner's innocence, the existence of an underlying constitutional violation provides a federal court with no basis for adjudicating a procedurally defaulted claim. *Goldblum v. Klem*, 510 F.3d 204, 225-226 (3d Cir. 2007). Only after the presentation of *new* evidence may a federal court proceed to consider whether, in light of *all* relevant evidence, it is more likely than not that no reasonable juror would vote to convict the petitioner of the crime for which he or she is incarcerated. *House*, 547 U.S. at 537-539; *Goldblum*, 510 F.3d at 225-226.

**B.    Habeas Corpus Relief**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed into law on April 24, 1996. Pub. L. No. 104-132; 110 Stat. 1214 (1996). Title I of the AEDPA revised the statutory provisions governing a federal court's authority to issue writs of habeas corpus. Pub. L. No. 104-132, §§ 101-108; 110 Stat. at 1217-1226. Because Rhodes' petition was filed after the effective date of the AEDPA, the Court must apply the standards applicable under that statute. *Werts v. Vaughn*, 228 F.3d 178, 195 (3d Cir. 2000).

The relevant statutory language, which was enacted as a part of § 104 of the AEDPA and is currently codified at 28 U.S.C. § 2254(d), provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). As the statutory language makes clear, only the United States Supreme Court can "clearly establish" federal law for purposes of the AEDPA. *Domes v. Wakefield*, Civil Action No. 05-457, 2006 WL 1437172, at *12, 2006 U.S. Dist. LEXIS 36376, at *41, n. 15 (W.D.Pa. January 19, 2006). A state-court decision can be fairly said to be "contrary to" clearly established federal law where it applies a rule that contradicts the governing law as articulated in a Supreme Court decision, or where it confronts a set of facts that is "materially indistinguishable" from that confronted by the Supreme Court but nevertheless reaches a result different than that reached by the Supreme Court in the applicable precedent. *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000). A state-court decision constitutes an "unreasonable application" of clearly established federal law where it "unreasonably applies the correct Supreme Court precedent to the facts of a case," or where it "unreasonably extends or refuses to extend that precedent to a new context where it should (or should not) apply." *Shelton v. Carroll*, 464 F.3d 423, 436 (3d Cir. 2006).

A federal court may not issue a writ of habeas corpus simply because it concludes in its independent judgment that a state court has *incorrectly* applied clearly established federal law. *Albrecht v. Horn*, 471 F.3d 435, 445 (3d Cir. 2006). Instead, the relevant question is whether the state court has applied a Supreme Court precedent to the facts of the petitioner's case in an "objectively unreasonable manner." *Price v. Vincent*, 538 U.S. 634, 641 (2003). A factual

determination made by a state court is presumed to be correct in a subsequent habeas corpus

proceeding, and the petitioner bears the burden of rebutting this presumption of correctness by

producing "clear and convincing evidence" that a contrary determination is warranted.  28

U.S.C. § 2254(e)(1).

## IV.   Discussion

### A.       Timeliness

Before the specific claims made by Rhodes are addressed, a few observations about the

timeliness of the instant petition are in order.  Under the AEDPA, an individual incarcerated

pursuant to the judgment of a state court desiring habeas corpus relief must generally file an

application for a writ of habeas corpus within one year of "the date on which the judgment

became final by the conclusion of direct review or the expiration of time for seeking such

review."[3]  28 U.S.C. § 2244(d)(1)(A).  On direct review, the Pennsylvania Supreme Court denied

Rhodes' petition for allowance of appeal on September 21, 1993.  Doc. No. 13-10, p. 1.  She had

ninety days to petition the United States Supreme Court for a writ of certiorari.  SUP. CT. R. 13.

Her conviction became final on December 20, 1993, when the time for seeking further

discretionary review expired.  Since Rhodes' conviction became final before the AEDPA was

signed into law on April 24, 1996, the limitations period applicable to her petition did not begin

to run until that date.  *Carey v. Saffold*, 536 U.S. 214, 217 (2002).  Therefore, in the absence of

tolling, she needed to file her petition on or before April 24, 1997.  *Douglas v. Horn*, 359 F.3d

257, 261, n. 5 (3d Cir. 2004).

The AEDPA's tolling provision provides that "[t]he time during which a properly filed

---

[3]The other events triggering the commencement of the one-year limitations period are not applicable to this case.  28 U.S.C. § 2244(d)(1)(B)-(D).

application for State post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).  Rhodes filed her first PCRA petition on April 25, 1995. Doc. No. 13-10, p. 3.  The Superior Court affirmed the denial of her PCRA petition on June 16, 1999.  Doc. No. 13-12, pp. 24-28.  She had until July 16, 1999, to petition the Pennsylvania Supreme Court for discretionary review.  PA. R. APP. P. 1113(a).  Because Rhodes filed a "notice of appeal" rather than a petition for allowance of appeal, the Pennsylvania Supreme Court "returned" her appeal to her on July 23, 1999.[4]  Doc. No. 23-3, p. 1.  As Rhodes points out, this action by the Pennsylvania Supreme Court was apparently contrary to a Pennsylvania statute requiring an "improvident" appeal to be treated as a petition for allowance of appeal.[5]  42 PA. CONS. STAT. § 724(b).  Although Rhodes' second PCRA petition was not received by the trial court until July 26, 2000, it was apparently mailed on July 18, 2000.  Doc. No. 21, p. 9. Pennsylvania employs a "prisoner mailbox rule" which treats a legal document as "filed" on the date that it is placed in the hands of prison authorities for mailing.  *Commonwealth v. Hopfer*, 965 A.2d 270, 271, n. 2 (Pa.Super.Ct. 2009).  If Rhodes' improvident "notice of appeal" was not a "properly filed" petition for allowance of appeal, her PCRA proceeding was no longer "pending" as of July 17, 1999.  In that case, a full year would have elapsed between the end of her initial round of collateral review and the filing of her second PCRA petition.

---

[4]The AEDPA's tolling provision does not toll the one-year limitations period during the period of time in which a state prisoner can petition the United States Supreme Court for a writ of certiorari on collateral review. *Lawrence v. Florida*, 549 U.S. 327, 329-336 (2007).

[5]It is acknowledged that the wording of Rhodes' "notice of appeal" may have led the Pennsylvania Supreme Court to believe that she was attempting to "appeal" a decision of the trial court rather than a decision of the Superior Court.  Doc. No. 23-3, p. 1.

22

Earlier this year, in *Jimenez v. Quarterman*, 129 S.Ct. 681, 686-687 (2009), the United States Supreme Court held that where a state court grants a criminal defendant the right to file an out-of-time direct appeal during state collateral review, but before the defendant has filed a petition for a writ of habeas corpus, the underlying judgment of conviction does not become "final" on direct review for purposes of the AEDPA's one-year statute of limitations until "the conclusion of the out-of-time direct appeal, or the expiration of the time for seeking review of that appeal." In other words, an out-of-time *direct* appeal essentially restarts the AEDPA's one-year limitations period. Subsequent to the decision in *Jimenez*, however, federal courts have held that a state court's decision permitting an untimely appeal from the denial of collateral relief does not retroactively toll the running of the AEDPA's statute of limitations during the period of time in which nothing was "pending" before a state court. *Streu v. Dormire*, 557 F.3d 960, 965-967 (8th Cir. 2009); *Drew v. Superintendent*, 607 F.Supp.2d 277, 280-282 (D.Mass. 2009). Although Rhodes' second PCRA petition resulted in the restoration of her right to seek discretionary review of the denial of *collateral* relief, it did not postpone the conclusion of *direct* review. Thus, the statute of limitations was running between the conclusion of the first PCRA proceeding (i.e., either July 16, 1999, or July 23, 1999, depending on whether the "notice of appeal" was a "properly filed" petition for allowance of appeal) and the commencement of the second PCRA proceeding (i.e., July 18, 2000).[6] *De Jesus v. Acevedo*, 567 F.3d 941, 942-944 (7th Cir. 2009).

---

[6]After the "return" of her "notice of appeal" in July 1999, Rhodes filed no motions with the Pennsylvania Supreme Court to extend the "pendency" of her first PCRA petition. *Kindler v. Horn*, 542 F.3d 70, 76-78 (3d Cir. 2008), cert. granted, 129 S.Ct. 2381 (2009). The trial court's decision permitting Rhodes to file an out-of-time petition for allowance of appeal *restored* (but did not *extend*) the pendency of the initial PCRA proceeding. *Streu v. Dormire*, 557 F.3d 960, 967, n. 2 (8th Cir. 2009).

On May 11, 2007, the trial judge reinstated Rhodes' right to file an out-of-time petition for allowance of appeal based on the *consent* of the Commonwealth.  Doc. No. 23-4, p. 1.  He did not hold that the Pennsylvania Supreme Court's "return" of Rhodes' "notice of appeal" had been improper as a matter of Pennsylvania law.  Had he done so, this Court would have been bound by that determination.  *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004).  Nevertheless, the trial court's summary order did not specifically state that the "notice of appeal" should have been treated by the Pennsylvania Supreme Court as a petition for allowance of appeal.  Hence, it is at least arguable that Rhodes' first PCRA proceeding was no longer "pending" as of July 17, 1999, and that the AEDPA's one-year statute of limitations had already expired before the filing of her second PCRA petition on July 18, 2000.  This question turns on whether the purported "notice of appeal" filed by Rhodes constituted a "properly filed" petition for allowance of appeal under Pennsylvania law.  28 U.S.C. § 2244(d)(2); 42 PA. CONS. STAT. § 724(b).

The Commonwealth apparently believes that the AEDPA's statute of limitations was tolled during the intervening year between the conclusion of the initial PCRA proceeding and the trial court's order restoring the pendency of that proceeding.  Doc. No. 33, p. 11.  For this reason, it does not affirmatively raise the statute of limitations as a defense to Rhodes' petition for habeas corpus relief.  In *Day v. McDonough*, 547 U.S. 198, 202-211 (2006), the United States Supreme Court held that a federal court has discretion to dismiss an untimely habeas corpus petition *sua sponte* under circumstances where the State has not intelligently waived its statute of limitations defense.  The Supreme Court also noted that, where the State has failed to raise the statute of limitations as a defense, a federal court should "determine whether the interests of

24

justice would be better served" by a merits-based disposition of the petition or a dismissal of the petition on statute-of-limitations grounds.  *Day*, 547 U.S. at 210, quoting *Granberry v. Greer*, 481 U.S. 129, 136 (1987).

In this case, "the interests of justice" would not be served by a *sua sponte* dismissal of Rhodes' petition on statute-of-limitations grounds.  Since the purported "notice of appeal" filed by Rhodes is unavailable for examination, the Court cannot say for sure that it should *not* have been treated as a petition for allowance of appeal.  If it was a "properly filed" petition for allowance of appeal, Rhodes' initial PCRA proceeding was still pending until July 23, 1999.  Of course, Rhodes obtained the relief sought in her second PCRA petition.  Consequently, *that petition* cannot be said to have been improperly filed.[7]  *Cone*, 129 S.Ct. at 1782 (observing that federal courts have no duty to apply state procedural rules that state courts have themselves declined to apply).  Moreover, the AEDPA's statute of limitations is subject to principles of equitable tolling.  *Urcinoli v. Cathel*, 546 F.3d 269, 272-278 (3d Cir. 2008).  Rhodes' difficulties in getting her PCRA petition before the Pennsylvania Supreme Court undoubtedly resulted from Lemons' abandonment of her case.  If the Court were to invoke the AEDPA's statute of limitations *sua sponte*, it would inevitably be forced to confront complex questions concerning whether the application of equitable tolling principles would be appropriate in this case.  *Seitzinger v. Reading Hospital & Medical Center*, 165 F.3d 236, 237-242 (3d Cir. 1999).  In light of these considerations, the fact that Rhodes' habeas corpus petition is arguably barred by the AEDPA's statute of limitations does not warrant the *sua sponte* dismissal of the petition as untimely.

---

[7]The trial judge had previously given Rhodes notice of his intention to dismiss her second PCRA petition as time-barred under 42 PA. CONS. STAT. § 9545(b)(1).  Doc. No. 13-14, p. 6.

### B.       The Ineffectiveness Claims

The Sixth Amendment to the United States Constitution provides that, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST., AMEND. VI.  The Counsel Clause of the Sixth Amendment is applicable to the States by virtue of the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335, 342-345 (1963).  "It has long been recognized that the right to counsel is the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)(emphasis added).

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the proper standards for determining when a defendant's trial counsel is ineffective.  Speaking through Justice O'Connor, the Supreme Court explained:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687.  The first component requires an inquiry into whether the performance of a defendant's counsel has fallen "below an objective standard of reasonableness." *Id.* at 688.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.*  The second component requires an inquiry into the impact that an identified deficiency has had on the defendant's trial.  In order to

set aside a conviction, a defendant must show that "there is a *reasonable probability* that, but for [his or her] counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 (emphasis added). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In determining whether a defendant has been prejudiced by constitutionally deficient representation, a court must consider "the totality of the evidence" heard by the trier of fact. *Id.* at 695. In situations where it is clear that a defendant cannot show that he or she has been prejudiced, a court is free to dispose of the case on that ground without deciding whether the representation provided to the defendant was constitutionally deficient. *Id.* at 697.

The Supreme Court has construed the Due Process and Equal Protection Clauses of the Fourteenth Amendment to include the right of a convicted individual to have the assistance of counsel for a first-level appeal provided by the State as a matter of right. *Halbert v. Michigan*, 545 U.S. 605, 609-610 (2005). Because this right to appellate counsel is grounded in the Fourteenth Amendment rather than in the Sixth Amendment, its dimensions are somewhat different than those of the right to trial counsel guaranteed under the Counsel Clause. *Martinez v. Court of Appeal of California*, 528 U.S. 152, 154-164 (2000). Nevertheless, in *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that a first-level appeal provided as a matter of right is not adjudicated in accordance with the Constitution "if the appellant does not have the *effective* assistance of an attorney." *Evitts*, 469 U.S. at 396 (emphasis added). Therefore, an appellant has a constitutional right to the effective assistance of counsel when pursuing a non-discretionary appeal that is similar to the right to the effective assistance of counsel afforded by the Counsel Clause to a defendant subjected to a criminal trial. An individual alleging that his or

her appellate counsel was ineffective must satisfy the *Strickland* standard in order to obtain

relief.  *United States v. Mannino*, 212 F.3d 835, 840, n. 4 (3d Cir. 2000).

The Equal Protection Clause of the Fourteenth Amendment provides that "No State shall

. . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST.,

AMEND. XIV, § 1.  In *Batson v. Kentucky*, 476 U.S. 79, 86-88 (1986), the Supreme Court held

that a prosecutor's use of a peremptory challenge to exclude an individual from jury service

based on his or her race constitutes a violation of the Equal Protection Clause.  Such a

discriminatory use of a peremptory challenge violates not only the constitutional rights of the

*prospective juror*, but also the constitutional rights of the *defendant* tried before the eventual

jury.  *Batson*, 476 U.S. at 86 ("Purposeful racial discrimination in selection of the venire violates

a *defendant's* right to equal protection because it denies *him* the protection that a trial by jury is

intended to secure.")(emphasis added).  Because the race-based exclusion of prospective jurors

from a jury panel constitutes a "structural" error that fundamentally undermines public

confidence in the criminal justice system, a finding that such an exclusion has occurred in a

particular criminal case warrants the automatic reversal of the defendant's conviction.  *Rivera v.

Illinois*, 129 S.Ct. 1446, 1455-1456 (2009).

The first two claims raised in Rhodes' habeas corpus petition are ineffectiveness claims.

The Commonwealth evidently used a peremptory challenge to strike Elinor Montgomery

("Montgomery"), an African-American woman, from the jury.  Doc. No. 28-3, p. 1; Doc. No. 28-

4, pp. 1-2.  Rhodes is African-American. Rhodes' trial counsel did not object to this peremptory

challenge.  Rhodes contends that her counsel was ineffective for failing to do so, and for failing

to raise his own ineffectiveness on direct appeal.  Doc. No. 28, pp. 24-31.

28

In *Commonwealth v. Grant*, 813 A.2d 726, 738 (Pa. 2002), the Pennsylvania Supreme Court held that ineffectiveness claims should generally be raised on collateral review rather than on direct review.  Prior to *Grant*, a claim of ineffectiveness needed to be raised at the earliest stage in the proceedings at which the attorney whose performance was being challenged was no longer representing the defendant.  *Commonwealth v. Hubbard*, 372 A.2d 687, 695, n. 6 (Pa. 1977).  Since Rhodes first obtained new counsel at the collateral-review stage, the difference between these two standards is inconsequential in this case.  In order to properly exhaust her ineffectiveness claims, Rhodes was required to present them to the Pennsylvania courts during the PCRA proceedings.

Although Rhodes exhausted a distinct ineffectiveness claim on collateral review, she did not base that claim on her counsel's failure to object to the Commonwealth's use of a peremptory challenge to exclude Montgomery from the jury panel.  Doc. No. 13-12, pp. 7-28. The Commonwealth points out that the ineffectiveness claims raised in Rhodes' habeas corpus petition were never presented to the Pennsylvania courts.  Doc. No. 33, pp. 16-17.  Interestingly, Rhodes does not address this issue in her responsive brief.  Doc. No. 39.  Thus, it is undisputed that Rhodes' ineffectiveness claims were not "exhausted" within the meaning of § 2254(b)(1)(A).

Since Rhodes has not presented her ineffectiveness claims to the Pennsylvania courts, she must satisfy the statutory exhaustion requirement on the alternative ground that there is "an absence of *available* State corrective process" for her to pursue.  28 U.S.C. § 2254(b)(1)(B)(i)(emphasis added).  This alternative statutory prerequisite to the litigation of Rhodes' ineffectiveness claims can be satisfied only if Pennsylvania law "clearly forecloses"

review of such claims by the Pennsylvania courts.  *Lines*, 208 F.3d at 162-165.  A careful

analysis of Pennsylvania law reveals that such review is clearly foreclosed under the provisions

of the PCRA.

The relevant portion of the PCRA provides:

**§ 9545.  Jurisdiction and proceedings**

\*\*\*
**(b) Time for filing petition.--**
(1) Any petition under this subchapter, including a second or subsequent petition,
shall be filed within one year of the date the judgment becomes final, unless the
petition alleges and the petitioner proves that:
> (i) the failure to raise the claim previously was the result of interference
> by government officials with the presentation of the claim in violation of
> the Constitution or laws of this Commonwealth or the Constitution or laws
> of the United States;
> (ii) the facts upon which the claim is predicated were unknown to the
> petitioner and could not have been ascertained by the exercise of due
> diligence; or
> (iii) the right asserted is a constitutional right that was recognized by the
> Supreme Court of the United States or the Supreme Court of Pennsylvania
> after the time period provided in this section and has been held by that
> court to apply retroactively.
(2) Any petition invoking an exception provided in paragraph (1) shall be filed
within 60 days of the date the claim could have been presented.
(3) For purposes of this subchapter, a judgment becomes final at the conclusion of
direct review, including discretionary review in the Supreme Court of the United
States and the Supreme Court of Pennsylvania, or at the expiration of time for
seeking the review.
(4) For purposes of this subchapter, "government officials" shall not include
defense counsel, whether appointed or retained.

42 PA. CONS. STAT. § 9545(b).  As the statutory language makes clear, the PCRA's one-year

statute of limitations would apply to a "second or subsequent" petition filed by Rhodes.  Rhodes'

conviction became final on December 20, 1993.  The PCRA's one-year statute of limitations

became effective on January 16, 1996.  *Commonwealth v. Robinson*, 837 A.2d 1157, 1158, n. 3

(Pa. 2003).  Because Rhodes' conviction became final before that date, she had until January 16, 1997, to file a timely PCRA petition.  *Commonwealth v. Sam*, 952 A.2d 565, 568, n. 2 (Pa. 2008).  That date passed more than twelve years ago.  Even if that date had not passed, the one-year grace period for petitioners whose convictions became final before the effective date of the statutory limitations period was available only to an individual filing his or her *first* PCRA petition.  *Commonwealth v. Fenati*, 748 A.2d 205, 206 (Pa. 2000).  Rhodes, of course, has already had one full round of collateral review.  Ineffectiveness claims of the kind asserted by Rhodes are cognizable under the PCRA.  42 PA. CONS. STAT. § 9543(a)(2)(ii).  The PCRA is the *sole* basis provided under Pennsylvania law for an incarcerated prisoner to collaterally attack his or her conviction and sentence.  *Commonwealth v. Ahlborn*, 699 A.2d 718, 721 (Pa. 1997).  Under these circumstances, the Pennsylvania courts would clearly lack jurisdiction to entertain Rhodes' ineffectiveness claims.  *Commonwealth v. Hall*, 771 A.2d 1232, 1234-1237 (Pa. 2001).  Consequently, any further attempt by Rhodes to exhaust such claims would be futile.

Since Rhodes has established that "there is an absence of available State corrective process" for her to pursue, she has satisfied the statutory exhaustion requirement.  28 U.S.C. § 2254(b)(1)(B)(i).  The inquiry, however, does not end there.  "A finding of futility merely eliminates the procedural pretense of requiring a federal habeas petitioner to return to an unavailable state forum for nonexistent relief."  *Lines*, 208 F.3d at 166.  "Out of respect for finality, comity, and the orderly administration of justice," a federal court ordinarily will not entertain the merits of a claim that has been procedurally defaulted under state law.  *Dretke v. Haley*, 541 U.S. 386, 388 (2004).  The Supreme Court has observed that, in this circumstance, "considerations of comity and concerns for the orderly administration of criminal justice require

31

a federal court to forgo the exercise of its habeas corpus power." *Francis v. Henderson*, 425 U.S. 536, 539 (1976).  Nonetheless, this general principle is a qualified one.  "[W]hile an adequate and independent state procedural disposition strips [the Supreme Court] of certiorari jurisdiction to review a state court's judgment, it provides only a strong prudential reason, grounded in 'considerations of comity and concerns for the orderly administration of justice,' not to pass upon a defaulted constitutional claim presented for federal habeas review." *Dretke*, 541 U.S. at 392-393.  Accordingly, the Court can entertain Rhodes' ineffectiveness claims if she can establish "cause" for defaulting them and resulting "prejudice" to her, or if she can establish that this Court's failure to consider her claims would result in a fundamental miscarriage of justice. *Hubbard*, 378 F.3d at 338.

Since Rhodes presents no new evidence of her innocence, she clearly cannot show that a miscarriage of justice would result from this Court's failure to consider the merits of her ineffectiveness claims. *Goldblum*, 510 F.3d at 225.  Moreover, an attorney's deficient performance can be properly characterized as the "cause" of a procedural default only where such deficiency is sufficiently egregious to constitute a violation of the United States Constitution. *Cristin v. Brennan*, 218 F.3d 404, 420 (3d Cir. 2002).  Rhodes had no *constitutional* right to counsel when pursuing collateral relief. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).  The constitutional right to the *effective* assistance of counsel is dependent on the constitutional right to counsel itself. *Evitts*, 469 U.S. at 396, n. 7.  Because the Constitution afforded Rhodes no right to counsel during the PCRA proceedings, she cannot rely on the failure of Lemons to raise her trial and appellate counsel's ineffectiveness on collateral review to establish "cause" for defaulting her ineffectiveness claims. *Hull*, 991 F.2d at 91.  Although

Rhodes' trial counsel's alleged ineffectiveness may have constituted "cause" for her default of

the underlying Equal Protection Clause claim on direct review, her ineffectiveness claims were

*themselves* subject to procedural default if they were not properly presented to the Pennsylvania

courts on collateral review.  *Edwards v. Carpenter*, 529 U.S. 446, 450-454 (2000).  Rhodes

makes no assertion that she had "cause" for defaulting *those* claims.  Indeed, she advances no

argument *at all* regarding the procedural default of her ineffectiveness claims.  Doc. No. 39.

Consequently, these claims are procedurally defaulted, and the Court need not address them

further.

### C.    The Admission of the Tape-Recorded Statement

The Self-Incrimination Clause of the Fifth Amendment provides that "No person . . .

shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. CONST.,

AMEND. V.  Initially, this provision, like the remaining provisions of the Bill of Rights, was

applicable only to the Federal Government.  *Barron v. Mayor of Baltimore*, 32 U.S. 243, 247-

251 (1833).  Even after the enactment of the Fourteenth Amendment, the Supreme Court

continued to hold that the Self-Incrimination Clause was not applicable to the States.  *Twining v.

New Jersey*, 211 U.S. 78, 96-114 (1908).  In *Brown v. Mississippi*, 297 U.S. 278, 285-287

(1936), the Supreme Court held that a conviction obtained because of a compelled confession

violates the Due Process Clause of the Fourteenth Amendment, which provides that "No State

shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S.

CONST., AMEND. XIV, § 1.  Under *Brown*, the Due Process Clause independently precludes the

admission of a compelled confession into evidence against a defendant.  In *Malloy v. Hogan*, 378

U.S. 1, 3-11 (1964), the Supreme Court recognized for the first time that the Self-Incrimination

Clause was incorporated within the Due Process Clause and, hence, applicable to the States.

Accordingly, both the Due Process Clause and the Self-Incrimination Clause precluded the

Commonwealth from using an involuntary confession against Rhodes at trial. *Dickerson v.*

*United States*, 530 U.S. 428, 433-435 (2000).

Rhodes contends that her confession was involuntary, and that it should not have been

introduced at trial. Doc. No. 28, pp. 32-39. It is undisputed that Rhodes properly exhausted this

claim on direct review. The standard for determining whether a statement was voluntarily or

involuntarily given was articulated by the United States Court of Appeals for the Third Circuit in

*Lam v. Kelchner*, 304 F.3d 256 (3d Cir. 2002). In *Lam*, the Court of Appeals explained:

> The Supreme Court has made clear that a statement is involuntary when the
> suspect's "will was overborne in such a way as to render his confession the
> product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288, 113 L.Ed.2d
> 302, 111 S.Ct. 1246 (1991). In determining whether a statement is voluntary,
> Supreme Court precedent requires consideration of "the totality of all the
> surrounding circumstances–both the characteristics of the accused and the details
> of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434, 147 L.Ed.2d
> 405, 120 S.Ct. 2326 (2000)(quoting *Schneckloth v. Bustamonte*, 412 U.S. 218,
> 226, 36 L.Ed.2d 854, 93 S.Ct. 2041 (1973)). These surrounding circumstances
> include "not only the crucial element of police coercion, *Colorado v. Connelly*,
> 479 U.S. 157, 167, 93 L.Ed.2d 473, 107 S.Ct. 515 (1986)," but may also include
> "the length of the interrogation, its location, its continuity, the defendant's
> maturity, education, physical condition, and mental health." *Withrow v. Williams*,
> 507 U.S. 680, 693, 123 L.Ed.2d 407, 113 S.Ct. 1745 (1992)(some internal
> citations omitted).

*Lam*, 304 F.3d at 264. The application of this standard, of course, requires a detailed

examination of the record.

Before the trial, Rhodes moved for the suppression of her tape-recorded interview with

Freeman and McCabe. A suppression hearing was held before the trial judge on October 10,

1990. At the hearing, testimony was taken from Marraway, Freeman, Rhodes and Mark

34

Rubenstein ("Rubenstein"), who was Rhodes' attorney.  Suppression Hearing Transcript

("SHT") at 4-102.  Marraway described how Rhodes was taken to the police station and

questioned about Boyle's rings.  SHT at 4-15.  Freeman testified that Rhodes had voluntarily

agreed to make a tape-recorded statement about how she had murdered Boyle, and that the

statement had not been the product of threats, coercion, or promises of lenient treatment.  SHT at

23-24.  Rubenstein refused to cross-examine Marraway and Freeman because he objected to the

trial judge's decision to preside over the hearing.  SHT at 14-15, 28-32.  Rhodes had apparently

asked the trial judge to recuse himself because of his prior service as an assistant district

attorney, but the trial judge had found no basis for recusal.  *Id.*  The trial judge admonished

Rubenstein that the decision not to cross-examine Marraway and Freeman was a "perilous

position" for Rhodes to take, since the trial court could not base a ruling on hypothetical

testimony not contained in the record.  SHT at 28-29.  Rubenstein refused to cross-examine

Marraway and Freeman even though such cross-examination would not have constituted a

waiver of the recusal issue.  SHT at 31-32.

　　　　After the Commonwealth's witnesses had concluded their testimony, Rhodes testified in

favor of her suppression motion.  She testified that Freeman and McCabe had threatened to arrest

her boyfriend and her uncle if she did not cooperate with their investigation into the Boyle

murder.  SHT at 45-46.  According to Rhodes, Freeman had warned her that she would never see

her children again if she did not reveal what she knew about the murder.  SHT at 47-48.  She

stated that Freeman had expressed sympathy regarding certain racial prejudices that she had

endured while working at the Center, and that he had told her that McCabe was married to a

black woman.  SHT at 49-51.  Rhodes further testified that she had been told by Freeman that

she would not be charged with first- or second-degree murder if she were to cooperate with the investigation into the crime.  SHT at 55.  She explained that she had agreed to give a taped confession because of her belief that such "cooperation" would result in lenient treatment.  SHT at 75-80.

At the conclusion of Rhodes' testimony, Rubenstein testified about his encounters with Rhodes subsequent to the tape-recorded statement.  Rhodes affirmatively waived her attorney/client privilege in order to enable Rubenstein to testify about what she had told him.  SHT at 89.  Rubenstein testified that, after he had explained to Rhodes the different degrees of "criminal homicide," she had told him that she was not facing charges for first- and second-degree murder.  SHT at 92-94.  He further stated that Rhodes had begun to cry after learning that Freeman and McCabe had "lied" to her about what charges would be filed against her.  SHT at 94.  Rubenstein also testified that Rhodes had been "very convinced" that McCabe was married to a black woman.  SHT at 96-97.

Freeman returned to the stand before the conclusion of the hearing.  He testified that McCabe's wife was white.  SHT at 99.  He denied that he had told Rhodes that McCabe was married to a black woman.  SHT at 100.  Freeman also denied that he had promised Rhodes that she would not be charged with first- or second-degree murder.  SHT at 102.

The trial judge denied Rhodes' motion for suppression, and the tape-recorded interview was introduced at trial.  TT at 215-236.  In the tape-recorded interview *itself*, Rhodes declared that she had not been threatened by her interrogators, and that she had not been promised anything in return for her statement.  TT at 236.  She stated that Freeman and McCabe had treated her "fine."  *Id.*

In his opinion of January 28, 1992, the trial judge recounted the testimony which had

been presented at the suppression hearing.  Doc. No. 13-4, pp. 11-14.  He specifically referenced

Rubenstein's testimony.  Doc. No. 13-4, p. 13.  Moving on to address the merits of Rhodes'

argument, the trial judge stated:

> Defendant contends that her confession was involuntary because it was
> induced as based upon promises of leniency.  This Court finds that under the
> totality of the circumstances that defendant's confession was voluntary, knowing
> and intelligent and was not the product of coercive police conduct.  The record
> clearly reflects that defendant on April 18, 1990 had been advised of her
> constitutional rights on at least four occasions either before and during her
> interviews.  At no time did defendant ask to speak to an attorney or seek legal
> assistance.  Defendant's demeanor was good and she exhibited no signs of fatigue
> or stress.
>
> With respect to the conduct exhibited by the homicide detectives, the
> Court finds no impropriety.  Defendant testified that during her interview she felt
> free to leave.  (N.T. 10/10/90 at 38).  Defendant's interviewers testified that they
> did not threaten defendant nor promised her anything in exchange for her
> confession.  This testimony is further corroborated and buttressed by the
> defendant's own taped statement in which she stated that she had been treated
> properly by the police and that no threats or promises had been made in exchange
> for her statement.  (See Appendix "A").  Finally, with respect to the fact that
> defendant had been confronted with evidence that she had pawned two of the
> victim's rings the Court finds that this, too, was proper inasmuch as police "are
> permitted to confront a suspect with incriminating evidence."  Commonwealth v.
> McFadden, ____ Pa. Super. ____, 559 A.2d 58, 60 (1989).  Accordingly, there is no
> merit to defendant's contention.

Doc. No. 13-4, pp. 15-16.  On direct appeal, the Superior Court summarily affirmed the trial

court's decision by generally deferring to the factual findings made by the trial judge.  Doc. No.

13-8, pp. 30-31.

The resolution of factual disputes presented in federal habeas corpus proceedings is

governed by 28 U.S.C. § 2254(e)(1), which provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a
> person in custody pursuant to the judgment of a State court, a determination of a

37

> factual issue made by a State court shall be presumed to be correct.  The applicant
> shall have the burden of rebutting the presumption of correctness by clear and
> convincing evidence.

28 U.S.C. § 2254(e)(1).  Interpreting § 2254(e)(1)'s statutory predecessor in *Miller v. Fenton*,

474 U.S. 104, 109-118 (1985), the Supreme Court held that a finding that a confession had been

voluntary was *not* a determination of a "factual issue" subject to the statutory presumption of

correctness.  The Supreme Court was careful to point out, however, that "subsidiary factual

questions" such as whether police officers have "engaged in the intimidation tactics alleged by

the defendant" *are* factual questions subject to the statutory presumption of correctness when

they have been previously resolved by a state court.  *Miller*, 474 U.S. at 112.

The question of whether a confession was voluntary is a mixed question of law and fact.

*Kirk v. Carroll*, 243 F.Supp.2d 125, 134 (D.Del. 2003).  While state-court determinations of

mixed questions are not entitled to the statutory presumption of correctness, they are subject to

the deferential standard applicable under the AEDPA's "unreasonable application" provision.

*Thompkins v. Berghuis*, 547 F.3d 572, 581 (6th Cir. 2008); *Hardcastle v. Horn*, 368 F.3d 246,

254 (3d Cir. 2004); *Duncan v. Morton*, 256 F.3d 189, 197 (3d Cir. 2001).  While the issue of

voluntariness is *itself* a mixed question of law and fact subject to independent consideration

under the "unreasonable application" standard, the determinations made by a state court

concerning "subsidiary factual issues on which voluntariness is based" are *themselves* presumed

to be correct.  *Reinert v. Larkin*, 211 F.Supp.2d 589, 600 (E.D.Pa. 2002).  Federal courts have

consistently held that credibility determinations are *factual* determinations for purposes of §

2254(e)(1).  *McWee v. Weldon*, 283 F.3d 179, 185-186 (4th Cir. 2002); *Suce v. Taylor*, 572

F.Supp.2d 325, 340 (S.D.N.Y. 2008); *Keener v. Bazzle*, 481 F.Supp.2d 521, 530 (D.S.C. 2007);

*Brown v. Sirmons*, 415 F.Supp.2d 1268, 1288 (N.D.Okla. 2006); *Pena v. Giurbino*, 345 F.Supp.2d 1065, 1071 (S.D.Cal. 2004); *Payne v. McKune*, 280 F.Supp.2d 1259, 1267 (D.Kan. 2003).

With respect to the underlying questions of whether Freeman and McCabe had threatened to arrest Rhodes' boyfriend and uncle, whether they had told Rhodes that she would never see her children again if she did not cooperate in their investigation, whether they had indicated to Rhodes that her willingness to confess to the crime would somehow preclude the Commonwealth from charging her with first- or second-degree murder, and whether they had told Rhodes that McCabe's wife was black, the trial judge credited the testimony of Freeman and discredited the testimony of Rhodes.  Doc. No. 13-4, pp. 8-16.  Rubenstein provided only second-hand testimony about what Rhodes had relayed to him about the interrogation session, not eyewitness testimony about what had happened during the session itself.  Although the trial judge did not expressly reject Rubenstein's testimony about what Rhodes had said *after* the interrogation session, he implicitly concluded that the underlying allegations made by Rhodes were not credible.  *Id.*

Rhodes argues that because the trial judge did not make specific findings of fact concerning Rubenstein's credibility, the trial judge's ultimate factual conclusions regarding the circumstances of the interrogation should not be presumed to be correct.  Doc. No. 39, pp. 4-9. This is a specious argument, since the factual determinations bearing on the issue of voluntariness center on the circumstances surrounding the interrogation itself, not on the circumstances surrounding Rhodes' subsequent description of the interrogation during her

meeting with Rubenstein.[8]  *Miller*, 474 U.S. at 117.  In any event, however, the argument advanced by Rhodes is based on the erroneous premise that only *explicit* factual determinations are presumed to be correct.  The statutory presumption of correctness applies to both *explicit* and *implicit* findings of fact.  *Campbell v. Vaughn*, 209 F.3d 280, 290 (3d Cir. 2000).  Thus, the presumption squarely applies to the trial judge's implicit determinations that Freeman and McCabe had not threatened to arrest Rhodes' boyfriend and uncle, implied that they could prevent Rhodes from seeing her children, promised Rhodes that she would not be charged with first- or second-degree murder, or told Rhodes that McCabe was married to a black woman.  The trial court was simply not required to make detailed findings addressing every piece of evidence contained in the record.  *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003).

The inquiry does not end there.  Rhodes can still rebut the presumption of correctness by presenting "clear and convincing evidence" that determinations contrary to those made by the trial judge are warranted at this stage.  28 U.S.C. § 2254(e)(1).  She attempts to surmount this hurdle by calling the Court's attention to McCabe's trial testimony.  Doc. No. 28, pp. 37-38.  At trial, McCabe testified that he and Freeman "may have" discussed with Rhodes the different degrees of murder incorporated within a general charge of criminal homicide.  TT at 267.  Nevertheless, McCabe did not testify that he and Freeman had assured Rhodes that she would not be charged with first- or second-degree murder if she were to agree to make a tape-recorded statement.  *Id.*  To the contrary, he specifically testified that Rhodes had *not* been offered "favorable treatment" in exchange for her cooperation.  TT at 266-268.  Hence, McCabe's

---

[8]The instant case is distinguishable from *Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005), in that this case does not involve a situation in which a law enforcement official is alleged to have procured a confession from a suspect by falsely claiming that the suspect's attorney had specifically authorized him or her to answer the questions posed to him or her during an interrogation session.  *Id.* at 310-327.

testimony at trial does not constitute "clear and convincing evidence" that Rhodes was induced to make a confession by improper offers of lenient treatment. *Richey v. Bradshaw*, 498 F.3d 344, 357 (6th Cir. 2007). The analysis must proceed on the assumption that the trial judge's factual findings were correct.

Rhodes attempts to establish that the Superior Court's decision affirming the trial court's finding of voluntariness constituted an "unreasonable application" of federal law, or that the decision "was based on an unreasonable determination of the facts in light of the evidence presented" during the proceedings in the Pennsylvania courts. 28 U.S.C. § 2254(d)(1)-(2). Based on the present state of the record, however, Rhodes' argument is without merit. As the trial judge explained in his opinion, Rhodes had been repeatedly advised of her constitutional rights prior to the commencement of the tape-recorded interview. Doc. No. 13-4, p. 15. During the interview *itself*, Rhodes acknowledged that she had not been "threatened or promised anything" by Freeman or McCabe, and that she was making her statement voluntarily. TT at 236. Moreover, the trial judge placed significant reliance on Rhodes' testimony that she had been free to leave the police station prior to her initial confession.[9] Doc. No. 13-4, pp. 15-16. In light of the evidence contained in the record, it was not objectively unreasonable for the Superior Court to affirm the trial judge's decision permitting the tape-recorded interview to be admitted into evidence. Accordingly, the admission of the interview cannot serve as a basis for habeas

---

[9]Because Rhodes voluntarily went to the police station to answer questions, this case is markedly different from *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004). In *Taylor*, the United States Court of Appeals for the Ninth Circuit determined that a state court's decision permitting the introduction of a taped confession had been objectively unreasonable under circumstances in which a 16-year-old boy had been awakened in the middle of the night by police officers, taken to a police station, interrogated for two-and-a-half hours, and coaxed into making a tape-recorded statement. *Id.* at 996-1018. This case does not involve such a concededly hostile apprehension and interrogation session.

corpus relief in this case.

###### D.      The Jury Instruction Concerning Rhodes' Testimony

In her petition, Rhodes asserts that habeas corpus relief is warranted because of an

allegedly erroneous jury instruction given by the trial judge.  Doc. No. 28, pp. 39-51.  On

December 30, 1990, Rhodes' trial counsel submitted proposed jury instructions to the trial court.

Doc. No. 28, p. 40.  Proposed Jury Instruction No. 8 read as follows:

> The defendant has a right to testify in his or her own behalf, and the jury has no
> right to arbitrarily disregard or disbelieve the testimony in whole or in part merely
> because he or she has been charged in an indictment with a crime; it is the duty of
> the jury to weigh and consider the testimony the same as that of any other witness
> and to give to his or her testimony such weight and credit as you may determine.

Doc. No. 28-6, p. 11.  Before the jury instructions were given at trial, the trial judge indicated

that "Point No. 8" would be "given in the standard form."  TT at 476.

When the time came for the giving of jury instructions, the trial judge gave the following

instruction concerning Rhodes' testimony:

> Now, the Defendant took the stand as a witness.  In considering her testimony,
> you will follow the general instructions that I gave you regarding the credibility
> of any witness.  You should not disbelieve the Defendant's testimony merely
> because she is the Defendant.  In weighing her testimony, however, you may
> consider the fact that she has a vital interest in the outcome of this trial.  You may
> take the Defendant's interest into account just as you would the interest of any
> other witness along with all other facts and circumstances bearing on credibility
> in making up your mind what weight her testimony deserves.

TT at 506.  After the jury instructions had been given, Rhodes' trial counsel raised an objection

at a sidebar conference, arguing that Proposed Jury Instruction No. 8 should have been given

instead of the instruction ultimately given by the trial judge.  TT at 534-535.  The objection was

overruled.  The colloquy between the trial judge and Rhodes' counsel indicates that the

instruction given to the jury had been the standard instruction in Pennsylvania, and that Proposed Jury Instruction No. 8 had been a modified version of that instruction. TT at 535. Thus, there was no inconsistency between the trial judge's promise to give the "standard" instruction and his subsequent decision not to give Proposed Jury Instruction No. 8.

Rhodes argues that the trial judge's instruction that the jury could take her "vital interest in the outcome of th[e] trial" into account in evaluating the reliability of her testimony constituted a violation of her rights under the Fifth, Sixth and Fourteenth Amendments. Doc. No. 28, p. 42. The Commonwealth argues that this claim was not exhausted, and that it has been procedurally defaulted because of the PCRA's statute of limitations. Doc. No. 33, pp. 14-17. The Commonwealth also argues that Rhodes' claim is substantively meritless. Doc. No. 33, pp. 24-26.

In order to establish her entitlement to habeas corpus relief, Rhodes must show that she has exhausted the remedies *available* in the Pennsylvania courts. 28 U.S.C. § 2254(b)(1)(A). In *O'Sullivan v. Boerckel*, 526 U.S. 838, 839-846 (1999), the United States Supreme Court held that discretionary review before the highest court of a State is generally "available" to a petitioner even though that court is not obligated to entertain his or her appeal. The Supreme Court went on to clarify, however, that there was "nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is unavailable." *O'Sullivan*, 526 U.S. at 847-848. In a concurring opinion, Justice Souter opined that the decision in *O'Sullivan* did not require a petitioner to exhaust a procedure declared by the State to be outside of the "standard review process." *Id.* at 850 (Souter, J., concurring).

On May 9, 2000, the Pennsylvania Supreme Court issued *In re: Exhaustion of State*

*Remedies in Criminal and Post Conviction Relief Cases*, No. 218 Judicial Administration Docket No. 1 ("Order 218"), which provided that direct criminal appellants and PCRA petitioners need not file petitions for allowance of appeal in order to exhaust all "available" state remedies for habeas corpus purposes.  The United States Court of Appeals for the Third Circuit has determined that Order 218 renders discretionary review before the Pennsylvania Supreme Court "unavailable" to incarcerated individuals.  *Lambert v. Blackwell*, 387 F.3d 210, 231-234 (3d Cir. 2004).  Nevertheless, the Court of Appeals has also held that Order 218 applies only prospectively, and that it has no application to cases involving petitioners whose time for seeking discretionary review had already expired prior to May 9, 2000.  *Wenger v. Frank*, 266 F.3d 218, 226 (3d Cir. 2001).  Consequently, any issue litigated by Rhodes on direct review needed to be presented to the Pennsylvania Supreme Court in a petition for allowance of appeal in order to be properly exhausted.  This is because a habeas corpus petitioner, in order to exhaust his or her claims, must invoke "one complete round" of the applicable State's appellate review process, thereby giving the courts of that State "one full opportunity" to resolve any issues relevant to such claims.  *O'Sullivan*, 526 U.S. at 845.

Rhodes litigated her claims concerning the trial court's jury instructions on direct review. In her brief to the Superior Court, Rhodes argued that the trial judge had erred in failing to give five specific jury instructions that she had proposed.  Doc. No. 13-5, pp. 56-60.  Proposed Jury Instruction No. 8 was one of the five proposed instructions listed in the brief.  *Id.*  Nevertheless, Rhodes did not specifically refer to the trial judge's comment about her "vital interest" in the outcome of the trial.  Instead, she made her argument in very general terms.  *Id.*  The Superior Court summarily rejected Rhodes' argument by stating that there had been no need for the trial

judge to use the "exact language" contained in Proposed Jury Instruction No. 8.  Doc. No. 13-8, p. 37.  Like her brief to the Superior Court, Rhodes' petition for allowance of appeal contained only a general claim concerning the trial judge's failure to give her proposed jury instructions.  Doc. No. 13-8, pp. 21-23.  It contained no explicit reference to the trial judge's statement concerning Rhodes' "vital interest" in the disposition of the criminal charges against her.  *Id.*

In order to properly exhaust a federal claim before a state court, a petitioner must make it clear to that court that his or her claim is based, at least in part, on the alleged violation of a federally-protected right.  *Dye v. Hofbauer*, 546 U.S. 1, 4 (2005).  It is not sufficient for a petitioner to rely *generally* on federal law.  Instead, he or she must be sufficiently specific about the precise nature of the federal claim at issue.  *Duncan v. Henry*, 513 U.S. 364, 366 (1995)("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him due process of law guaranteed by the Fourteenth Amendment.  The failure is especially pronounced in that respondent did specifically raise a due process objection before the state court based on a different claim–that the pleading was uncertain as to when the offense occurred.").  It is of no moment that the particular basis for Rhodes' objection may have been available to the appellate courts by reference to the trial transcript.  A federal claim is not "fairly presented" to a state court if that court must look beyond "a petition or brief" in order to discover or understand the basis for the claim.  *Baldwin v. Reese*, 541 U.S. 27, 30-33 (2004).  For these reasons, the Commonwealth makes a strong argument to the effect that Rhodes has procedurally defaulted her claim regarding the trial judge's jury instruction concerning the weight to be given to a defendant's testimony at trial.

Under the present circumstances, however, the Court need not determine whether the claim has been procedurally defaulted.  Under 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  There is some disagreement among federal courts concerning whether § 2254(b)(2) applies solely with respect to the statutory exhaustion requirement, or whether it also applies in the procedural default context.  *Perruquet v. Briley*, 390 F.3d 505, 515-516 (7th Cir. 2004)(collecting cases).  Nevertheless, the United States Court of Appeals for the Third Circuit has applied § 2254(b)(2) in situations involving procedural default.  *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005); *Hameen v. Delaware*, 212 F.3d 226, 251-252 (3d Cir. 2000).  Other courts within this circuit have done likewise. *Carter v. Carroll*, 479 F.Supp.2d 432, 438, n. 4 (D.Del. 2007).  Since Rhodes' claim is clearly lacking in merit, it can be dismissed on that basis without regard to whether it has been procedurally defaulted.

In support of her claim that the trial judge violated her constitutional rights by calling the jury's attention to her interest in the outcome of the trial, Rhodes relies on the Supreme Court's decisions in *Hicks v. United States*, 150 U.S. 442 (1893), and *Reagan v. United States*, 157 U.S. 301 (1895).  Doc. No. 28, pp. 44-45.  In *Hicks*, the Supreme Court observed:

> Still it must be remembered that men may testify truthfully, although their lives hang in the balance, and that the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf.  Such a privilege would be a vain one if the judge, to whose lightest word the jury, properly enough, give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability.

*Hicks*, 150 U.S. at 452.  In *Reagan*, the Supreme Court declared that there mere fact that an

46

individual is a defendant does not render his or her testimony "unworthy of belief." *Reagan*, 157 U.S. at 305.

It is beyond dispute that the Constitution affords a criminal defendant the right to testify in his or her own defense at trial. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). The language in *Hicks* and *Reagan* relied upon by Rhodes, however, was not based on a *constitutional* right to testify. Instead, it was based on a *statutory* right to testify. *Reagan*, 157 U.S. at 305. Admittedly, some courts have held that a defendant's *constitutional* rights are implicated when the reliability of his or her testimony is impugned by a trial judge's jury instructions. *United States v. Brutus*, 505 F.3d 80, 84-90 (2d Cir. 2007). Nonetheless, in order to obtain habeas corpus relief, Rhodes must demonstrate that the Superior Court's decision affirming her conviction "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the *Supreme Court of the United States*." 28 U.S.C. § 2254(d)(1)(emphasis added). While the decisions of "inferior" federal courts may inform the inquiry as to whether a Supreme Court precedent has been unreasonably applied, they cannot *clearly establish* federal law for purposes of the AEDPA.[10] *Blake v. Kirkpatrick*, Civil Action No. 08-9288, 2009 WL 536508, at *3, 2009 U.S. Dist. LEXIS 18723, at *9 (S.D.N.Y. March 4, 2009).

Aside from the language in *Hicks* and *Reagan*, Rhodes appears to base her argument on

---

[10]That is not to say that the Supreme Court can *create* law. A judicial decision construing a law does not bring that law into being. Instead, it delineates the contours of the law for the purpose of deciding the case at issue. *Danforth v. Minnesota*, 128 S.Ct. 1029, 1035 (2008)("As we have already explained, the source of a 'new rule' is the Constitution itself, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule."). Nevertheless, in the present habeas corpus context, "the only question that matters" is whether the Superior Court's decision affirming Rhodes' conviction "was contrary to, or involved an unreasonable application of," a Supreme Court precedent. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

precedents from the First and Second Circuits.  Doc. No. 28, pp. 39-51.  Those precedents,

however, do not strengthen Rhodes' claim.  In all but one of the decisions cited by Rhodes in

which a jury instruction was attacked on constitutional grounds, the instruction at issue included

a statement affirmatively indicating to the jury that the defendant's interest in being exonerated

had given him or her a motive to testify falsely.  *United States v. Gaines*, 457 F.3d 238, 242 (2d

Cir. 2006); *United States v. Dwyer*, 843 F.2d 60, 62-63 (1st Cir. 1988); *United States v. Matias*,

836 F.2d 744, 749 (2d Cir. 1988); *United States v. Rollins*, 784 F.2d 35, 36 (1st Cir. 1986);

*United States v. Assi*, 748 F.2d 62, 68, n. 8 (2d Cir. 1984); *United States v. Araujo*, 539 F.2d 287,

290-291 (2d Cir. 1976).  The other decision, which involved a challenge to an instruction

indicating that a defendant's interest at trial "is usually greater than that of any other witness,"

did not reverse the conviction under review.  *Carrigan v. United States*, 405 F.2d 1197, 1198 (1st

Cir. 1969).  None of the First or Second Circuit decisions relied upon by Rhodes involved an

instruction such as the one presently at issue, in which the trial judge simply informed the jury

that the defendant's "vital interest" in the outcome of the trial could be considered in the same

manner in which any other witness' interests could be considered in determining his or her

credibility.  TT at 506.

The claim asserted by Rhodes is simply unsupported in American jurisprudence.  There

is no basis for concluding that a trial judge cannot inform a jury of its prerogative to consider a

defendant's interest in being exonerated in determining what weight to give to his or her

testimony.  Indeed, the very authority relied upon by Rhodes undermines her argument.  In

*Reagan*, the Supreme Court explained:

> It is within the province of the court to call the attention of the jury to any matters
> which legitimately affect his testimony and his credibility.  This does not imply

> that the court may arbitrarily single out his testimony and denounce it as false. The fact that he is a defendant does not condemn him as unworthy of belief, but at the same time it creates an interest greater than that of any other witness, and to that extent affects the question of credibility.  It is, therefore, a matter properly to be suggested by the court to the jury.

*Reagan*, 157 U.S. at 305.  The trial judge's instruction in the instant case did nothing more inform the jury that Rhodes' interest in being acquitted was a matter that could be considered in determining her credibility as a witness.  TT at 506.  This instruction was "perfectly proper" under Supreme Court precedent.  *Portuondo v. Agard*, 529 U.S. 61, 71 (2000).

Since the challenged jury instruction did not violate any federally-protected right enjoyed by Rhodes, it follows *a fortiori* that the Superior Court's decision rejecting Rhodes' challenge to that instruction was not objectively unreasonable for purposes of the AEDPA.  The instruction simply provides no basis for the granting of habeas corpus relief.

###### E.        The Robbery and Burglary Convictions

Rhodes' final claims are based on the premise that the evidence adduced at trial was insufficient as a matter of law to support her convictions for robbery and burglary.  Doc. No. 28, pp. 52-53.  The trial judge sentenced Rhodes to terms of not less than ten nor more than twenty years of imprisonment for these crimes.  ST at 23-24.  These sentences were imposed as being concurrent with each other but consecutive to the sentence of life imprisonment.  *Id.*  Because the concurrent sentences for robbery and burglary were imposed as sentences consecutive to the life sentence, Rhodes has not begun to serve the sentences at issue.  Nevertheless, the Supreme Court has held that consecutive sentences must be viewed "in the aggregate, not as discrete segments."  *Garlotte v. Fordice*, 515 U.S. 39, 47 (1995).  Therefore, Rhodes is "in custody" for the crimes of robbery and burglary even though the duration of her life sentence will, as a

practical matter, prevent her from serving the sentences imposed for those crimes.  *Peyton v. Rowe*, 391 U.S. 54, 55-67 (1968).  The merits of Rhodes' claims can be addressed even though a favorable resolution of those claims would not result in her release from prison.  *Preiser v. Rodriguez*, 411 U.S. 475, 487-488 (1973).

A criminal conviction is not secured in conformity with the Due Process Clause unless the State has proven each element of the charged offense "beyond a reasonable doubt."  *In re Winship*, 397 U.S. 358, 361-368 (1970).  In *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), the Supreme Court made it clear that a state prisoner who alleges that the evidence in support of his or her conviction "cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt" states a federal constitutional claim.  "[S]uch a claim is cognizable in a federal habeas corpus proceeding."  *Jackson*, 443 U.S. at 321.  The standard for determining whether a particular conviction constitutes a violation of the Due Process Clause "must be applied with explicit reference to the substantive elements of the [relevant] criminal offense as defined by state law."  *Id.* at 324, n. 16.  In evaluating a claim under *Jackson*, a federal habeas corpus court faced with a factual record supporting conflicting inferences must presume that the trier of fact has resolved all dispositive conflicts in favor of the prosecution, and must defer to such resolution.  *Id.* at 326.

Rhodes argues that the evidence presented by the Commonwealth at trial was insufficient as a matter of law to enable a reasonable jury to conclude, beyond a reasonable doubt, that she had committed the crimes of robbery and burglary.  Doc. No. 28, pp. 52-53.  These claims were

litigated on direct review.[11]  They were summarily rejected by the trial court.  Doc. No. 13-4, p.

18.  In its opinion affirming the trial court's decision, the Superior Court disposed of the claims

concerning the robbery and burglary convictions by stating as follows:

> In her next issue, appellant challenges the sufficiency of the evidence with respect
> to the charges of robbery and burglary.  As to the robbery charge, she argues that
> the evidence was not sufficient to prove that she had the intent to commit the theft
> of the rings when she attacked and killed the victim.  As to the burglary charge,
> appellant contends that the evidence was not sufficient to prove that she intended
> to commit a felony when she entered the victim's apartment.  These arguments,
> however, are based on appellant's own version of events, which the jury was not
> required to accept as true.  Viewing the evidence presented, as well as all
> reasonable inferences therefrom, in the light most favorable to the
> Commonwealth, see Commonwealth v. Smouse, 406 Pa.Super. 369, 376, 594
> A.2d 666, 669 (1991), sufficient evidence was presented from which the jury
> could conclude that appellant entered the victim's apartment intending to commit
> a theft.

Doc. No. 13-8, p. 32.  The claims were contained within Rhodes' petition for allowance of

appeal, which was ultimately denied by the Pennsylvania Supreme Court.  Doc. No. 13-8, pp.

16-18.

In order to properly evaluate Rhodes' Due Process Clause claims under *Jackson*, the

Court must consider the evidence presented at trial in light of the specific elements of the crimes

at issue.  *Jackson*, 443 U.S. at 324, n. 16.  Pennsylvania's robbery statute is codified at 18 PA.

CONS. STAT. § 3701(a), which provides:

### § 3701.  Robbery

---

[11]The Commonwealth's argument that Rhodes did not exhaust these claims is without merit.  Doc. No. 33,
pp. 14-15.  It is clear from Rhodes' brief to the Superior Court that her challenges to the robbery and burglary
convictions were based on both the United States Constitution and the Pennsylvania Constitution.  Doc. No. 13-5, p.
39.  It was proper for her to focus her arguments on principles of Pennsylvania criminal law, since the standard for
determining whether the Due Process Clause has been violated "must be applied with explicit reference to the
substantive elements of the [relevant] criminal offense as defined by state law."  *Jackson v. Virginia*, 443 U.S. 307,
324, n. 16 (1979).

**(a) Offense defined.--**
(1) A person is guilty of robbery if, in the course of committing a theft, he:
 (i) inflicts serious bodily injury upon another;
 (ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;
 (iii) commits or threatens immediately to commit any felony of the first or second degree;
 (iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury; or
 (v) physically takes or removes property from the person of another by force however slight.
(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

18 PA. CONS. STAT. § 3701(a).  Pennsylvania's burglary statute is codified at 18 PA. CONS. STAT.

§ 3502(a), which provides:

**§ 3502.  Burglary**
**(a) Offense defined.–**A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises are at the time open to the public or the actor is licensed or privileged to enter.

18 PA. CONS. STAT. § 3502(a).  It is beyond dispute that Rhodes inflicted "serious bodily injury"

upon Boyle, and that she did so while inside of Boyle's apartment.[12]  Rhodes attacks the robbery

conviction on the ground that the Commonwealth did not present evidence that she had killed

Boyle "in the course of committing a theft."  Doc. No. 28, p. 53.  She attacks the burglary

conviction on the ground that the Commonwealth failed to establish that she had already formed

---

[12]Pennsylvania law defines the term "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  18 PA. CONS. STAT. § 2301.

the intent to commit a crime inside of Boyle's apartment at the time of entry.[13]  *Id.*

Rhodes' arguments concerning the robbery conviction are unpersuasive.  The Commonwealth presented evidence establishing that Rhodes had *both* stabbed Boyle to death *and* stolen her rings.  Although Rhodes argues that she did not intend to take the rings until *after* she had already killed Boyle, the jury was entitled to infer from the evidence presented at trial that Rhodes had intended to steal the rings *before* committing the stabbing.  *Commonwealth v. Robertson*, 463 A.2d 1133, 1136 (Pa.Super.Ct. 1983).  After all, Rhodes acknowledged at trial that she had sold Boyle's rings within a few hours of the stabbing.  TT at 311.  The evidence clearly supported an inference that Rhodes had stabbed Boyle *because* of a desire to steal the rings.  *Commonwealth v. Ford*, 650 A.2d 433, 438 (Pa. 1994).  An intent to commit a robbery that is contemporaneous with an intent to perpetrate a homicide can be established by an inference arising from acts committed by an individual shortly after a murder.  *Robertson*, 463 A.2d at 1136, n. 4.  It was for the trier of fact alone to determine how, and under what circumstances, Rhodes had obtained Boyle's rings.  *Commonwealth v. Calderini*, 611 A.2d 206, 208-209 (Pa.Super.Ct. 1992).

Rhodes' contentions concerning the burglary conviction fare no better.  She obviously committed criminal acts inside of Boyle's apartment.  In order to secure a conviction for burglary, the Commonwealth was not required to prove what *particular* crime Rhodes had

---

[13]An individual who is licensed or privileged to enter a building does not commit the crime of burglary even if he or she enters that building with the intent to commit a crime therein.  *Commonwealth v. Edwards*, 903 A.2d 1139, 1148 (Pa. 2006).  Rhodes does not appear to base her challenge to the burglary conviction on an assertion that she was licensed or privileged to enter Boyle's apartment.  Doc. No. 28, p. 53 ("To be guilty of burglary, the defendant must have entered the premises with the intent to commit a crime.").  Indeed, she did not raise the issue of "license" or "privilege" when she challenged her burglary conviction in the Pennsylvania courts.  Doc. No. 13-5, pp. 39-41; Doc. No. 13-8, pp. 16-18.

intended to commit inside of the apartment at the time of entry.  *Commonwealth v. Alston*, 651 A.2d 1092, 1095 (Pa. 1994).  Her intent to commit *a crime* inside of the apartment at the time of entry can be inferred from the totality of the circumstances.  *Williams v. Brooks*, 435 F.Supp.2d 410, 426 (E.D.Pa. 2006).  Because the Commonwealth presented ample evidence to establish that Rhodes had committed multiple crimes inside of the apartment, it was reasonable for the jury to conclude that she had intended to commit at least one of those crimes prior to entering.

In applying *Jackson*, the Superior Court was not required to view individual *pieces* of evidence "as fragments isolated from the *totality* of the evidence."  *Commonwealth v. Hopkins*, 747 A.2d 910, 914 (Pa.Super.Ct. 2000)(emphasis added).  Instead, the Superior Court was obliged to accord deference to the findings of the jury, which had listened to *all* of the evidence presented at trial.  *Jackson*, 443 U.S. at 326.  Given that the Commonwealth had presented sufficient evidence to establish each element of the crimes of robbery and burglary beyond a reasonable doubt, the Superior Court's decision affirming Rhodes' convictions for robbery and burglary did not constitute an unreasonable application of *Jackson*.  Accordingly, Rhodes is not entitled to habeas corpus relief.

### F.       Certificate of Appealability

In the absence of a COA, a petitioner may not appeal a federal district court's denial of a habeas corpus petition.  28 U.S.C. § 2253(c)(1)(A).  A COA may be issued only where an unsuccessful petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  In this context, the relevant question is whether reasonable jurists would find a district court's assessment of a petitioner's claims to be "debatable or wrong."  *Slack v.*

*McDaniel*, 529 U.S. 473, 484 (2000).  To obtain a COA regarding claims that have been

dismissed on procedural grounds, a petitioner must show *both* "that jurists of reason would find

it debatable whether [his or her] petition states a valid claim of the denial of a constitutional

right" *and* "that jurists of reason would find it debatable whether the district court [i]s correct in

its procedural ruling."  *Id.*  Since reasonable jurists would not quarrel with the foregoing

assessment of the substantive and procedural issues in this case, Rhodes is not entitled to a COA

with respect to any of the issues raised in her petition or discussed in this report and

recommendation.

**V.**     **Conclusion**

        For the foregoing reasons, it is respectfully recommended that Rhodes' petition for a writ

of habeas corpus and request for a COA be denied.  In accordance with the applicable provisions

of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C)] and Rule 72.D.2  of the Local

Rules of Court, the parties shall have ten days from the date of the service of this report and

recommendation to file written objections thereto.  Any party opposing such objections shall

have ten days from the date on which the objections are served to file its response.  A party's

failure to file timely objections may constitute a waiver of that party's appellate rights.


Dated: September 18, 2009                                    By the Court:


                                                            Lisa Pupo Lenihan
                                                            United States Magistrate Judge


cc:     Kimberly R. Brunson, Esq.

Email: kimberly_brunson@fd.org
Lisa B. Freeland, Esq.
Email: lisa_freeland@fd.org
Rebecca D. Spangler
Email: Rebecca.Spangler@da.allegheny.pa.us
Rusheen R. Pettit
Email: Rusheen.Pettit@da.allegheny.pa.us